John D. Moore, Esq.
Nevada State Bar No. 8581
MOORE LAW GROUP, PC
3715 Lakeside Drive, Suite A
Reno, NV 89509
(775) 336-1600
john@moore-lawgroup.com
Attorney for Mark Premo

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MARK PREMO, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| OPTIMUM CX, LLC, an Arizona limited liability company fka FUSION CONTACT CENTERS, LLC; DOES 1 through 10, inclusive, | Jury Demanded |
| Defendants. | |

COMES NOW Plaintiff Mark Premo, (sometimes hereafter referred to as "Plaintiff") and sues Defendant Optimum CX, LLC, an Arizona limited liability company fka Fusion Contact Centers, LLC, (sometimes hereafter referred to as "Fusion" or "Defendant") and alleges as follows:

### NATURE OF THE ACTION

This is an action under Title I of the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendment Act of 2008 ("ADAAA"), and Title I of the Civil Rights Act of 1991, to correct unlawful employment practices on the basis of disability or on the basis of an apparent disability and to provide appropriate relief to Plaintiff Mark Premo, who was adversely affected by such practices. As alleged with greater particularity throughout this Complaint, Plaintiff alleges that he was previously employed with Defendant Optimum CX, LLC, when it was known as Fusion Contact Centers, LLC, in its Reno, Nevada area office and that Defendant unlawfully discriminated against Plaintiff on the basis of his disability or perceived disability in that Plaintiff suffers diagnosed

social and interactive disorders within the autism spectrum, making it difficult at times for Plaintiff to interact socially with co-workers and supervisors.  Plaintiff also alleges that Defendant failed to provide Plaintiff with a reasonable accommodation considering his disability or perceived disability.

## JURISDICTION AND VENUE

1.       Jurisdiction of this Court is invoked pursuant to 28 U.S.C.  §§ 1331, 1337, and 1343. This action is authorized and instituted pursuant to Section 107(a) of the ADA and Section 102 of the Civil Rights Act of 1991, 41 U.S.C. § 1981a, 42 U.S.C.  § 12117(a) (incorporating Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e-5(f)(1) and (3)).

2.       The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Nevada.

## PARTIES

3.       Mark Premo is an adult male individual and citizen of the United States who currently resides in Fernley, Nevada.  At all times relevant herein, unless otherwise stated, Mr. Premo was an employee of Optimum CX, LLC, fka Fusion Contact Centers, LLC, within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et seq., and within the meaning of all other applicable law.

4.       Plaintiff is informed and believes and thereupon alleges that Fusion is an Arizona limited liability company that does business in Reno, Nevada, among other locations.  At all relevant times stated herein, Fusion employed more than fifteen employees at its office located in Reno, Nevada, and was an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et seq.

5.       At all relevant times, Fusion has continuously been a limited liability company doing business in the state of Nevada, and has continuously had at least 15 employees.

6.       At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce within the meaning of Section 101(5) of the ADA, 42 U.S.C. 12111(5), and Section 101(7) of the ADA, 42 U.S.C. § 12111(7).

7.      At all relevant times, Defendant has been a covered entity under § 101(2) of the ADA, 42 U.S.C. § 12111(2).

8.      All of the acts and failures to act alleged herein were duly performed by and attributable to all Defendant(s), each acting as a successor, agent, employee, alter ego, indirect employer, joint employer, or under the direction and control of others, except as specifically alleged otherwise.  Said acts and failures to act were within the scope of such agency and/or employment, and each Defendant(s) participated in, approved and/or ratified the unlawful acts and omissions by the other Defendant(s) complained of herein.  Whenever and wherever reference is made in this Complaint to any act by a Defendant or Defendants, such allegations and references shall also be deemed to mean the acts and failures to act of each Defendant acting individually, jointly, and/or severally.

9.      Plaintiff is ignorant of the true names and capacities of each Defendant sued as DOES 1 through 10, inclusive, and therefore Plaintiff sues said defendants by fictitious names.  Plaintiff reserves the right to amend the Complaint to name each DOE defendant individually or corporately as it becomes known.  Plaintiff alleges that each DOE defendant was in some manner responsible for the acts and omissions alleged herein and Plaintiff will amend his Complaint to allege such responsibility when the same shall have been ascertained by Plaintiff.

### ADMINISTRATIVE PREREQUISITES

10.     Plaintiff has complied with all administrative prerequisites to action under the Americans with Disabilities Action, under Section 706 of Title VII of the Civil Rights Act of 1964, and under any other applicable law, and has been issued a right to sue letter, dated December 7, 2018. Plaintiff has thus exhausted all administrative prerequisites prior to bringing this action and is permitted to pursue his rights in federal court.

### STATEMENT OF THE CASE

11.     By way of background, Plaintiff has been clinically diagnosed within the autism spectrum in that Plaintiff suffers cognitive disabilities that make it difficult for Plaintiff to interact socially with others and to read non-verbal communication.  Plaintiff's written diagnosis of this

disability is attached hereto as **Exhibit 1.**

12.    When Plaintiff was originally hired with Defendant in or about October of 2014, he made Defendant aware of Plaintiff's written diagnosis and the associated cognitive disabilities related to that diagnosis and Plaintiff shared the last two pages of his written diagnosis and associated disabilities found in **Exhibit 1** with the Defendant through its human resources department before Plaintiff was hired.

13.    Plaintiff's written diagnosis and his disabilities associated therewith became a part of his employee file with the Defendant after he was hired.

14.    With the written diagnosis, Plaintiff also shared recommendations from Plaintiff's doctor on how to work with Plaintiff in the work place, which set forth various ways an employer or a supervisor could approach Plaintiff to obtain a successful employment interaction.  **Id.**

15.    For example, Plaintiff's doctor suggested that social interactions at work would be best if supervisors and others approached Plaintiff in a calm and clear manner, speaking to him directly and providing him with clear instructions.  **Id.**  Plaintiff's doctor also outlined that conversation should be had with Plaintiff privately because Plaintiff is prone to being distracted or offended and that written instructions often work best with the Plaintiff.  **Id.**  Plaintiff's doctor also noted that Plaintiff has a difficult time understanding when he is being blunt and perhaps rude or insensitive.  **Id.**

16.    Plaintiff's doctor also outlined how Plaintiff has a very limited ability to read non-verbal cues and social cues, that he takes some instructions too literally, and that he sometimes expresses himself in an uncaring manner when he does not mean to do so.  **Id.**  Being threatened with job discipline or claims that his job may be at risk were also not helpful to the Plaintiff.  **Id.**

17.    Plaintiff began work with Defendant after he was hired in October of 2014 and received high marks for his work.  Things were going very well with Plaintiff's initial supervisor who understood how to approach Plaintiff and how to communicate with him despite his disabilities.  Under these circumstances, Plaintiff was thriving in his work environment and received raises and other commendations.  Plaintiff's initial supervisor understood Plaintiff and how to communicate with him,

despite his disabilities.

18.     Eventually, in or about late 2016, Plaintiff was assigned to a new supervisor.  This supervisor did not understand Plaintiff's condition and how to approach Plaintiff.  It seemed, at times, that Plaintiff's new supervisor had no understanding of Plaintiff's disability at all and did not know how to communicate with Plaintiff, even though Plaintiff's disability and ways to communicate with him had been made available to Defendant years before.

19.     In or about December of 2016, Plaintiff was given a warning for making a comment to a telephone customer that did not portray Defendant in a positive manner.  Rather than approach Plaintiff as set forth in the written diagnosis of Plaintiff's disability, Plaintiff was approached by his new supervisor like any other employee, in a public manner in front of others, that was embarrassing to Plaintiff.  This affected Plaintiff's work and his work environment.

20.     In or about January of 2017, Plaintiff received additional feedback from the new supervisor related to another call Plaintiff had taken that day.  Plaintiff was told in front of others of some things he had done correctly in that call, but he was also informed of areas where he could improve.  The areas where Plaintiff could improve were similar or the same as the issues addressed to Plaintiff in or about December of 2016.  Plaintiff responded to this treatment in a blunt matter, stating that "he did not care" about the issue being brought up again, attempting to convey that he understood that he needed to work on this issue because it was raised before in December of 2016.

21.     Because Plaintiff's disability prevents him from understanding when he is being blunt, he did not understand or believe that he was being blunt with his supervisor.

22.     Three days after this interaction with his new supervisor, Plaintiff's employment was terminated with the Defendant.  During the time between this interaction with his supervisor and his termination from employment, Plaintiff attempted to explain that his blunt manner of speaking was not intended and that his written diagnosis of his disability showed this.  Defendant then claimed that there was no written diagnosis of Plaintiff's disability set forth in his employment file and that Defendant did not know what Plaintiff was talking about.

23.     After he was terminated, Plaintiff sought help from an autism foundation in Nevada that provided him with assistance to attempt to get his job back.  Through conversations between this foundation and Defendant, Plaintiff attempted to explain his condition and requested a reasonable accommodation to be allowed to return to work if the Defendant would attempt to comply with the written recommendations set forth in Plaintiff's written diagnosis that Plaintiff shared with Defendant after he was initially hired in 2014.

24.     Defendant again during this time informed Plaintiff through the autism foundation in Nevada that the Defendant did not find any written diagnosis of his condition in Plaintiff's employment file.  Since his termination, Plaintiff requested and received a copy of his employment file with the Defendant and the written diagnosis and recommendations of Plaintiff's doctor, that Plaintiff gave to Defendant when he was hired in 2014, was not contained in his employment file. Apparently, the written diagnosis and its recommendations on how to communicate with Plaintiff were scrubbed from his file, which exacerbated the problem because Plaintiff's new supervisor in late 2016 and early 2017 likely did not know Plaintiff's condition and did not know how to interact with Plaintiff, even though Plaintiff had made his condition known to Defendant when he was first hired.

25.     Even though Plaintiff's condition was known to Defendant when Plaintiff was first hired, Defendant refused to allow Plaintiff to return to work, citing his blunt communications with his new supervisor as the cause of his termination.  Blunt communication, however, is the manifestation of the very disability that Plaintiff suffers as diagnosed by his doctor.

26.     Plaintiff's requested reasonable accommodation to be communicated with in a clear and concise manner, to be communicated with privately and not in front of others, and to receive clear instructions preferably in writing was something that Defendant had been performing from 2014 until Plaintiff was assigned a new supervisor in 2016.  Plaintiff's old supervisor treated Plaintiff in a manner consistent with Plaintiff's diagnosis and the requested reasonable accommodation.  Plaintiff's new supervisor did not.  Defendant unreasonably refused to return Plaintiff to work under optimum working conditions commensurate with Plaintiff's disability.

27.     Defendant discriminated against Plaintiff by firing him for the very issue, i.e., sometimes blunt communications with other staff members, that needed to be addressed by Defendant in its supervisory style directed towards Plaintiff.  Defendant was made aware of the way Plaintiff needed to receive instructions from his supervisors.  Despite this knowledge, Defendant refused and refuses to accommodate Plaintiff or to offer him his job back.

28.     Defendant failed to provide Plaintiff with a continuing reasonable accommodation, including but not limited to failing to consider Plaintiff's condition when communicating with other staff, failing to take steps to communicate with Plaintiff in the manner described by his doctor, and failing to keep in Plaintiff's employment file the written diagnosis of Plaintiff's condition and recommendations from his doctor.

29.     Plaintiff, even after he was fired, attempted to have his job restored with the assistance of a local autism foundation that advocated for Plaintiff with Defendant.  Despite these efforts, Defendant refused to return Plaintiff back to work.

30.     Defendant failed to engage in the interactive process in good faith by unreasonably denying Plaintiff's requests for a reasonable accommodation that considered his condition.

31.     Defendant, by scrubbing Plaintiff's employment file and removing Plaintiff's written diagnosis from the file, engaged in bad faith conduct that impeded Plaintiff's ability to keep his job or to obtain the reasonable accommodation Plaintiff requested.

32.     The different treatment that Plaintiff received early in his employment from his former supervisor demonstrates that Defendant could provide Plaintiff with a reasonable accommodation, which only need to include a shift in how other employees communicated with Plaintiff at work.

33.     Defendant's conduct subjects Defendant to punitive damages in this case.

34.     By its conduct, Defendant has deprived Plaintiff of equal employment opportunities and otherwise affected his status as an employee because of his actual and/or perceived disability.

35.     Defendant's conduct towards Plaintiff was intentional and caused Plaintiff emotional distress.

36.     Defendant's conduct towards Plaintiff was done with malice or with reckless indifference towards Plaintiff's federally protected rights.

WHEREFORE, Plaintiff prays for the following relief:

1.     For a permanent injunction enjoining Defendant, its officers, successor, assigns, and all persons within Defendant's employ from engaging in any employment practices that discriminate based on disability;

2.     For an order directing Defendant to institute and carry out policies, practices, and programs to ensure that it would not engage in unlawful employment practices in violation of any laws stated in this Complaint;

3.     For an order directing Defendant to make whole Plaintiff by providing appropriate back pay with prejudgment interest, in an amount to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices, including but not limited to rightful place reinstatement or front pay;

4.     For an order directing Defendant to make Plaintiff whole by providing compensation for past and future pecuniary losses, including but not limited to out-of-pocket expenses suffered by Plaintiff which resulted from Defendant's conduct in an amount to be determined at trial;

5.     For an order directing Defendant to make Plaintiff whole by providing non-pecuniary compensation resulting from Defendant's conduct, such as, but not limited to, losses associated with emotional pain, suffering, inconvenience, mental anguish, humiliation, and loss of enjoyment of life, in an amount to be determined at trial;

6.     For an order directing Defendant to pay Plaintiff punitive damages for Defendant's malicious and/or reckless conduct in an amount to be determined at trial;

///

///

///

///

8

7.     For an award of costs to bring this action;

8.     For such other and further relief as the Court deems appropriate.

DATED this 28th day of February, 2019.

MOORE LAW GROUP, PC


By /s/   John D. Moore
          John D. Moore, Esq.
          Nevada State Bar No. 8581
          3715 Lakeside Drive, Suite A
          Reno, NV  89509
          (775) 336-1600 telephone
          (775) 336-1601 fax
          john@moore-lawgroup.com
          Attorney for Plaintiff Mark Premo

| INDEX OF EXHIBITS | | |
|---|---|---|
| Exhibit Number | Description of Exhibit | No. of Pages |
| 1 | Right to Sue Letter | 1 |

# EXHIBIT 1

Right to Sue Letter

# EXHIBIT 1

Right to Sue Letter

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  Mark Premo<br>1256 W. Newlands #23<br>Fernley, NV 89408 | From:  Los Angeles District Office<br>255 E. Temple St. 4th Floor<br>Los Angeles, CA 90012 |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 34B-2017-01127 | Karrie L. Maeda,<br>State & Local Coordinator | (213) 894-1100 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court** <u>WITHIN 90 DAYS</u> **of your receipt of this notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Rosa M. Viramontes,
**District Director**

December 7, 2018
*(Date Mailed)*

Enclosures(s)

cc:  Peter A. Claypatch
Manager
PO BOX 3906
Stateline, NV 89449